[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter was tried before the Regional Family Trial Docket, on a referral from the Danbury Judicial District, on January 13th and 14th, 2003. The Plaintiff and Defendant testified and numerous exhibits were introduced. The court has considered all of the credible evidence presented to it and carefully considered the respective criteria for orders of child support, health insurance, payment of children's medical expenses, alimony, property settlement, division of debt and award of counsel fees. The court makes the following findings of facts and orders:
The parties were married on July 7, 1990, at Waterbury, Connecticut. The court finds that it has jurisdiction over the marriage. One of the parties has lived in the State of Connecticut for more than one year prior to bringing this action. The following minor child has been born to the parties since the date of the marriage:
Nicolette Teixeira Marcal date of birth April 8, 1992; and
Kelly Teixeira Marcal, date of birth August 14, 1995
No other minor children have been born to the Wife since the date of the marriage. The parties are not receiving state assistance. The court finds that the marriage between the parties has broken down irretrievably and there is no reasonable prospect of reconciliation.
The husband is 36 years old and in good health. He received his GED in 1993 and an Associates degree in Manufacturing Engineering, from Naugatuck Community College in 2000. Mr. Marcal is a native of Portugal and became a US citizen in 1994 or 1995.
Mr. Marcal has been employed by the Barden Division, of FAG Holding Corporation, since January 1989. He is currently a production supervisor and earns a salary of approximately $55,900.00 per year plus "suggestion" CT Page 648 bonus pay which totaled $1,981.74 for 2002 (Plaintiff's Exhibits 7, 8 16). Mr. Marcal claimed that he anticipated earning less in 2003 due to plant shutdowns/furloughs. He introduced plaintiff's Exhibit 31 to show the 2002 furlough days, 21 days for the year, consisting of 6 days in the first 6 months of the year. Plaintiff's Exhibit 31 shows the scheduled shutdowns/furloughs for the first 6 months of 2003 — 12 days in the first 6 months of the year. Exhibit 31 indicates that employees may use vacation, personal/sick or floating holidays for the dates that the plant will be closed. Exhibit 31 indicates that unemployment compensation benefits may be available for individuals that are eligible. The court concludes that the present evidence doesn't indicate that Mr. Marcal will suffer a substantial reduction in his salary for 2003. The court has used a salary of $55,900.00 for purposes of computing the child support guidelines and alimony award.
Mr. Marcal testified on direct examination that he is paying approximately $86.00 per week for medical insurance benefits for the family. He also testified that he anticipated a 15% increase in February 2003 but provided no documentation to verify that claim. On cross-examination, Mr. Marcal admitted that he is reimbursed in part by his employer for his medical insurance. An examination of plaintiff's Exhibits 7 8 shows that $41.67 is paid to Mr. Marcal every pay period as partial reimbursement for his medical insurance cost of $186.13.
Mrs. Marcal is 39 years old and graduated from Eastern Connecticut State University with a bachelor's degree. She is presently employed at Leisure Cooler as a general office employee. She works 35-37 hours a week and earns $14.00 per hour during the months of April or May through August, when she might work up to 42 hours per week. Leisure Cooler provides it's 12 employees with no medical insurance benefits. Her previous employer was Pyramid Services where she worked as an accounts receivable clerk. She testified the highest salary she has earned was approximately $28,000 per year.
Mrs. Marcal is in good health physically. She has been hospitalized twice during the marriage for mental health problems: the first time in 2000 for 1 week and the second time in March 2001 for a period of 3 weeks. Additionally, she qualified for, and received, social security disability benefits for a period of approximately 1 1/2 years beginning in 2001. Her disability benefits were in the amount of $200.00 weekly.
The family home is located at 27 North Nabby Road, Danbury, Connecticut, and was purchased in November 1991 for $100,000.00. The husband and wife both testified that the home has been improved through CT Page 649 the efforts of the husband, his family members and friends, and the wife's father. The husband had a Comparative Market Analysis done by Real Estate Agent Raul Ligero, Century 21, Scalzo Realty in October 2002 (Plaintiff's Exhibit 6). The expected sales price at that time was $265,000. The husband testified at trial that the value has increased since October and Mr. Ligero would list the property for $289,000. The current mortgage is $69,657.00. Mr. Ligero has agreed to list the property for a 5% real estate commission. The wife objects to using Mr. Ligero as the selling agent because she views him as being in cahoots with her husband; she would like a real estate agent utilized that neither party knows. The estimated equity in the family home after deducting 7% for the real estate commission, conveyance taxes, and legal fees is in the range of $199,000. The couple disagrees how the proceeds should be divided. The husband is seeking a 50/50 division of the net proceeds and the wife is seeking a 60/40 division in her favor.
The couple agreed that the Wife's mother gave them $5,000 for the closing costs (but disputed whether it was a wedding gift or a separate gift towards the purchase of the home) but dispute how the remainder of the $20,000 was generated. Mr. Marcal claims it was from $5,000 of marital savings the couple scraped together during their first year of marriage and the balance from their wedding gifts of approximately $15,000. The wife testified she had a good job at The Hartford at the time of the marriage and had accumulated $15,000.00 in savings before the marriage. She testified that the couple used the money from their wedding to pay the caterer, the photographer and honeymoon expenses. The wife did not have any documentation available to prove that she had $15,000 in premarital savings and the Husband offered no explanation of how the wedding and honeymoon expenses were paid for other than from the wedding gifts. Given Mr. Marcal's lack of candor to the court in his financial dealings throughout the marriage, the court finds the wife's explanation credible and will give her a $15,000 credit on her share of the equity in the marital home ($15,000 premarital savings).
Mr. Marcal claims he owes his brother, Lino Marcal, the sum of approximately $17,000+. He claimed that $15,000 of the debt was incurred for the purchase of a Ford Ranger in 1995 (which has since been sold), which the husband drove, and his wife's 1997 Saturn plus additional sums borrowed during the course of the dissolution. Plaintiff's Exhibit 27 documents the loan for the Saturn on May 22, 1997, which was to be repaid at the rate of $200.00 per month. Plaintiff also introduced a Union Saving passbook (Plaintiff's Exhibits 9 23) held under the names of the husband and wife but allegedly containing money belonging to Lino Marcal. Some of the money was claimed to have been deposited by the wife to repay the Saturn car. Additionally, the CT Page 650 husband made loan and deposits from checks cashed by the husband from his brother's landscaping business. The husband testified that his brother traveled out of the country frequently (particularly in the winter) and he collected his checks and paid his bills while Lino Marcal was away. However, he admitted to making a $20,000 cash deposit during the summer which would have been a busy period for a landscaping company. Exhibit 27 stops on July 24, 1997 and Exhibit 9 covers the period from 11/10/00 to 4/30/01. The wife claimed she gave her lawyer the bankbook covering the period from July 1997 to November 2000, but neither the original nor the copies were available at trial.
The plaintiff also introduced Exhibit 22, which is a small notebook containing his handwritten notations regarding transactions between the husband and his brother. Also introduced was Plaintiff's Exhibit 21, the Plaintiff's Chase VISA bills, on which his brother made a number of charges to supposedly reduce the debt owed to him. Although the court has been able to connect some of the VISA charges to the notations made by plaintiff in his notebook (Exhibit 22), the court is unable to determine what is a credit, debit or what, if anything, is currently due the husband's brother, Lino Marcal.
The testimony adduced at trial was clear that the husband and his brother commingled their funds in the savings account, used the same credit card account, and that the husband regularly cashed his brother's checks from his business and deposited the proceeds into a bank account under the names of the husband and wife. The husband also testified that he used his brother's money in this account on a number of occasions to pay household bills. The Wife testified she overheard a conversation with her husband and his brother to the effect that they were hiding money from the IRS.
The wife testified that her loan from Lino Marcal for the Saturn was paid off about a year ago. She testified that she deposited $50.00 a week into the Exhibit 23 savings account most weeks. If she was running short of money she would play catch up in subsequent weeks. The loan was taken out May 22, 1997 (Plaintiff's Exhibit 27); if the wife made relatively regular payments of $50 per week, it should have been paid off in approximately 3 1/2 years or in October 2000. After examining Exhibit 27, and noting that 48 deposits of $50.00 were made between May 1997 and July 1998, the court finds the wife's testimony credible and finds that the Saturn loan has been paid in full.
The husband sold the Ford Ranger in August 2002 for $3,000. However, contrary to all logic, instead of using the proceeds to pay off the loan from brother Lino for the truck, he repaid his brother Carlos $3,000 CT Page 651 towards $5,000 he borrowed for his divorce retainer, yet he seeks to be credited by the court, for the amount he claims he owes Lino, from the proceeds of the sale of the house.
Additionally, a number of "investments" were held by the Husband, supposedly for his brother Lino, including a Putnam Investment account (Defendant's Exhibit D), which produced dividend and capital gains income reported on the couples' 1999 tax return. This account no longer exists. Mr. Marcal testified this account contained approximately $5,000.00. Mr. Marcal testified this account was transferred to his brother, Lino Marcal, in 1999 or 2000.
Defendant's Exhibit E is a Webster Bank certificate of deposit in the husband's name, supposedly containing Lino's money. The couple paid taxes on this interest income in 1999. This account no longer exists but originally contained $8,000.00 according to the husband.
Defendant's Exhibit F is a People's Bank certificate of deposit in the name of the couple's daughter, Nicolette Marcal, with the husband as custodian. The husband testified at trial that this was also Lino's money. When the court inquired why he would have put Lino's money in his daughter's name, Mr. Marcal explained that his accountant told him, if he had extra money, to put it in his daughter's name to reduce his taxes. No explanation was ever offered by the plaintiff to explain why he put hisbrother's money in his daughter's name. The couple paid taxes on this interest income in 1999. This account no longer exists.
The husband's commingling of assets with his brother is either a deliberate attempt to hide assets from his wife or an attempt on the part of the brothers to avoid the payment of income tax on income from the brother's landscaping business. The court concludes that it was an attempt to hide income from the IRS, as the husband's modest salary and the family expenses would not have permitted the accumulation of assets documented at trial. This court is compelled to report this scheme to evade income taxes to the appropriate authorities.
The husband violated the automatic orders on two occasions. In August, 2002, he sold his 1995 Ford Ranger (without paying his brother the balance due on the original $15,000 loan) and purchased a 2001 Ford Escape claiming the Ranger was too small and unsafe to transport the children in. The Ford Escape was financed and he owes $16,650.00 on the car. Mr. Marcal initially testified he borrowed $3,000 from a friend, Tony Fernandes. However, only when the court examined Plaintiff's Exhibit 10 (the loan papers for the Ford Escape), and noted that the down payment was only $2,000 and inquired what the husband did with the other $1,000, CT Page 652 did Mr. Marcal admit the down payment was less than the claimed $3,000.
Mr. Marcel also violated the automatic orders by taking a $10,600 loan from his 401K account without court authorization and while a Motion to Restrain was pending (Plaintiff's Exhibit 11). Mr. Marcal attempted to justify his violation of the automatic orders by claiming that he needed the money to pay his lawyer a trial retainer. However, again, the entire balance was not used to pay his lawyer.
The wife claimed that the husband purchased land with his brother Carlos in North Carolina in 1999. The husband admitted he traveled to North Carolina on two occasions with Carlos to purchase the property with his brother. He claimed he was on the trip to assist his brother due to his limited use of the English language. Carlos Marcal, and his wife Marie Theresa Marcal, both testified that the property was purchased by Carlos and the husband but the property was solely owned by Carlos. Plaintiff's Exhibit 20 is the deed to the property in North Carolina and does not contain the husband's name as owner. However, the wife argued that the husband paid the real estate taxes on this property in January 2002 and his brother paid the taxes for July 2002 (Plaintiff's Exhibit 39), indicating joint ownership of the property. Given the fact that the husband is a W-2 wage earner and the fact that the family debt and expenses equal or exceeded the couple's income, the court finds the wife failed to meet her burden of proof that the husband has an ownership interest in the North Carolina property.
The husband and wife dispute how the furnace installed in the family home will be paid for. The wife maintains that the 2000 tax refund was earmarked for the furnace replacement and the husband claims the refund was received in the spring of 2002; the new furnace was installed in October 2001 when the funds had already been spent on household bills. The husband claims to have borrowed $3,000 from a friend, Perdigito Amilcar, to pay for the furnace and needs to repay the debt. Given the husband's violation of the automatic orders twice during the pendency of the case, the court is not ordering the wife to share in the payment of the replacement of the furnace and is denying the husband's request that the payment of the wife's share of the household expenses be retroactive to September 2002.
Finally, the husband claimed that the wife had not paid any of the bills required to operate the family home since the couple began their current birdnesting arrangement in March 2002. However, the wife was able to produce a number of money orders that verified she paid for groceries; swimming and gymnastics lessons for the minor children; purchase of the bulk of the children's clothing and footwear; daycare; CT Page 653 cable TV bill; her own cell telephone bill; and the couples' automobile insurance (until the husband purchased the new Ford Escape and the Wife objected to paying insurance on two cars for the husband).
 ORDERS
After considering all of the statutory criteria set forth in General Statutes § 46b-84 as to support of a minor child, § 46b-215a-1
et. seq., Regs. Conn. State Agencies, as to child support, § 46b-62
as to counsel fees, § 46b-66a as to conveyance of real property, § 46b-81 as to assignment of property and transfer of title, §46b-82 as to the award of alimony, § 46b-84 as to medical insurance for minor child, together with applicable case law and the evidence presented here, the court hereby enters the following orders:
1. DISSOLUTION OF MARRIAGE:
A decree dissolving the marriage, on the grounds of irretrievable breakdown, shall enter on January 17, 2003.
2. MEDICAL INSURANCE — WIFE:
The husband shall pay one-half of the costs of COBRA medical insurance coverage, from his employer, for the Wife for as long as he is legally able to provide it. The wife shall pay the other half of the cost of her COBRA benefits.
3. MEDICAL INSURANCE AND UNREIMBURSED MEDICALS — CHILDREN:
The husband shall maintain, at his sole expense, the present medical/dental insurance for the children, which is provided to the husband through his employment. If said insurance is no longer available to the husband through his employment, the parties shall equally share the cost of obtaining such medical and dental insurance. The wife shall be responsible for the first $100.00 per year of unreimbursed medical and dental expenses. Thereafter, the parties shall split the cost of any unreimbursed medical, dental, optical, psychological, orthodontic and prescriptive drug expenses, incurred on behalf of the minor children, according to the Guidelines (the wife share being 54% and the husband's share being 46%) for as long as the husband is obligated to pay child support for said children. The wife shall submit all documentation for unreimbursed medical expenses within 30 days of her receipt of the documentation. The husband shall pay the wife his share of the unreimbursed medical expenses for the minor children within 30 days of his receipt of documentation from the wife. CT Page 654
4. CUSTODY/VISITATION
The court finds that the agreement of the parties dated January 13, 2003, regarding custody and visitation is in the best interest of the minor children and it is incorporated herein by reference. The court shall retain jurisdiction over this matter for the next year to monitor progress of the parenting plan and maintain continuity of the court orders regarding custody and visitation.
5. REAL ESTATE:
The parties shall immediately list the family home for sale at its fair market value with a MLS real estate agent familiar with real property values in the Danbury, Connecticut area. The listing agent shall not be Raul Ligeiro, the agent who prepared the fair market analysis for the husband. However, the agent shall be an agent from the Century 21, Scalzo Realty, Inc. The parties are to fully cooperate in the listing, showing and closing of the property. The parties shall accept the first bona fide offer within 3% of the asking price. If the home is not sold within 45 days of listing, the price shall be reduced by agreement of the parties after consultation with their real estate broker. The Husband and Wife shall cooperate in leaving the premises in broom-clean condition. While occupying the house, they shall also be responsible for paying 50% for all minor repairs to the property that cost less than $500 in payments to third parties or for materials. The parties shall split equally the cost of paying third persons to perform major or structural repairs costing more than $500.00.
When the family home is sold, the proceeds shall be divided as follows: after all expenses from the sale of the home (gross proceeds less the payoff of the first mortgage, realtor commissions, attorneys fees for sale, conveyance taxes and recording fees) have been paid, the wife shall receive the first $15,000.00 from the net proceeds; the remainder shall be divided with the Husband and the Wife each receiving 50% of the balance.
6. CHILD SUPPORT:
The Husband shall immediately pay to the Wife the sum of $192.00 per week as child support for the two children, said sum being in compliance with the Child Support Guidelines. This order shall take effect immediately as the court is also ordering the wife to pay 1/2 the household expenses while the birdnesting parenting plan remains in place and shall continue after the family home has been sold and the parties CT Page 655 maintain separate residences. A contingent wage withholding order shall enter.
The husband has requested a deviation from the child support guidelines because the minor children shall be with him 1/3 of the time as opposed to the traditional alternating weekends and 1-2 evenings a week for dinner. Given the great disparity of earning capacity between the husband and wife, and the wife's history of hospitalizations and receipt of social security benefits in the recent past, the court finds that it would be inappropriate to deviate from the child support guidelines in the present case.
The obligations of support and maintenance of the minor children shall terminate as each such child attains the age of eighteen (18) years, marries, dies, becomes employed full time being no longer enrolled in high school, or ceases to reside with the Wife under circumstances where the Wife is no longer furnishing the child's support or becomes otherwise emancipated, which ever occurs first.
Notwithstanding that a child has reached the age of eighteen (18) years, if the child is a full time high school student and continues to reside with the Wife, the Husband shall continue to pay child support as specified above, until the child completes the twelfth (12) grade or attains the age of nineteen (19) years, whichever occurs first.
7. ALIMONY:
The Husband shall immediately pay to the Wife alimony of $105.00 per week for a period of five (5) years from the date of the dissolution, non-modifiable as to term unless the Wife dies, remarries, or cohabitates as defined by statute.
This order shall take effect immediately as the court is also ordering the wife to pay 1/2 the household expenses while the birdnesting parenting plan remains in place and shall continue after the family home has been sold and the parties maintain separate residences. A contingent wage withholding order shall enter.
8. LIFE INSURANCE:
The Husband shall continue to maintain his current life insurance provided by his employer in the amount of $100,000.00, with the Wife as the beneficiary for as long as he is obligated to pay child support and alimony. The Husband shall provide to the Wife proof of said insurance on an annual basis. CT Page 656
9. PENSIONS, IRA ACCOUNTS, 401K ACCOUNTS AND DEFERRED COMPENSATIONACCOUNTS:
The parties shall equally divide all pensions, IRA accounts, 401K accounts and deferred compensation accounts as listed on their respective financial affidavits by means of a Qualified Domestic Relations Order, if needed. The parties shall equally share the cost of preparing the necessary documents. The division of the retirement accounts shall be completed within 45 days of the date of judgment. Each party shall be awarded joint and survivorship benefits to protect each party in the event of the other's death. The value of the husband's 401K account shall be computed prior to the loan taken out by him in violation of the automatic orders.
10. DIVISION OF DEBTS:
Except as otherwise provided herein, the Husband shall be responsible for the debts on his financial affidavit and the Wife shall be responsible for the debts on her financial affidavit.
11. INCOME TAX EXEMPTIONS:
The Husband and Wife shall take one child as a dependent for income tax purposes every year for as long as the husband's child support and unreimbursed medical expense payments are current. When one child is available as a dependency exemption the parties shall alternate the exemption with the husband having the exemption in even numbered years and the wife having the exemption in odd numbered years.
12. PERSONAL PROPERTY:
If the parties are unable to agree on the division of their personal property from the marital home, they shall submit to mediation by Danbury Family Services. If no agreement is reached with respect to any item of personal property, the court shall resolve the dispute on motion of either party.
The family dog shall be the sole property of the husband.
13. EDUCATIONAL SUPPORT:
Pursuant to Public Act #02-128, An Act Concerning Educational Support, and the parties failure to waive their right to request educational support for their minor children, the court shall retain jurisdiction CT Page 657 over the parents contribution towards the payment of the children's higher education.
14. MOTOR VEHICLES:
The parties shall be entitled to their respective motor vehicles and shall hold the other harmless and indemnified from all outstanding loans, personal property taxes and registration. If it is necessary to transfer title and/or registration to either or both of the vehicles, the parties shall complete the necessary paperwork within 30 days of the date of judgment.
15. ATTORNEY FEES:
The parties shall each be solely responsible for their own attorney fees. The parties shall equally share the cost of the fees for the attorney for the minor children. The fees for the attorney for the minor children shall be paid in full within 45 days of the date of judgment.
16. BIRDNESTING COST SHARING:
The Husband and Wife shall each have exclusive occupancy of the marital residence at 15 North Nabby Road, Danbury, CT, during his or her parenting time with the minor children. They shall never occupy the home at the same time. The Husband and Wife shall be equally responsible for, and pay, 50% of all liabilities associated with said residence including but not limited to the first mortgage, taxes, insurance, routine maintenance costs, groceries and utilities.
The husband shall submit copies of all the household bills to the wife and they shall exchange grocery receipts to determine the amount owed by the wife to the husband, who shall make the payments. The wife's payments to the husband shall be made via check or money order. Neither, the husband or the wife, shall remove food or household supplies from the family home at the end of their parenting time. Neither parent shall hide food or household products to prevent the use thereof by the other parent during his/her time in the family home.
Neither the Husband nor the Wife shall permit waste or damage to the property. The minor children shall remain in the family home regardless of which parent has sole occupancy of the family home. Neither party shall entertain an unrelated guest of the opposite sex overnight while he/she has sole occupancy of the marital home.
17. INTERIM POST JUDGMENT ORDERS:
CT Page 658
These orders shall be considered interim post judgment orders in the event of an appeal by either party.
18. JURISDICTION:
The Regional Family Trial Docket shall retain jurisdiction over this case for a period of one year from the date of judgment; any motions regarding custody and/or visitation shall be filed with the Regional Family Trial Docket.
By the Court,
Holly Abery-Wetstone, Presiding Judge CT Page 659